

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **SAMUEL HILL,** | § | **Case No.  08-36267** |
| | § | |
| **Debtor.** | § | **Chapter 13** |
| | § | |

## MEMORANDUM OPINION REGARDING: (1) THE CHAPTER 13 TRUSTEE'S OBJECTION TO DEBTOR'S CLAIM OF EXEMPTIONS; AND (2) THE CHAPTER 13 TRUSTEE'S MOTION TO MODIFY A CONFIRMED PLAN
### [Doc. Nos. 77, 79]

### I. INTRODUCTION

This Memorandum Opinion concerns the right of Samuel Hill (the Debtor) to exempt the proceeds to be paid pursuant to a settlement of a lawsuit against the company insuring his homestead.  The suit involves a cause of action where the insurance carrier allegedly failed to pay sufficient proceeds under the policy after Hurricane Ike damaged the Debtor's homestead.[1] The lawsuit was filed almost two years after the Debtor filed his bankruptcy petition, but the Debtor did not disclose this lawsuit or seek to exempt any recovery therefrom by amending his Schedules.  Now, after the suit has been prosecuted and a proposed settlement has been negotiated, the Debtor seeks to exempt a portion of the proceeds that the insurer will pay under the terms of the settlement.  The Debtor asserts that he is entitled to exempt these proceeds pursuant to the homestead laws of the State of Texas.  The Chapter 13 Trustee (the Trustee) objects to this exemption by arguing that proceeds generated from the settlement of a lawsuit are not exemptible under Texas law.  According to the Trustee, the fact that the lawsuit involves a

---

[1] Hurricane Ike occurred on September 13, 2008, and caused extensive property damage in several counties in Texas.

breach of contract over the policy insuring the Debtor's homestead is irrelevant; he emphasizes that no Texas law permits exemption of a lawsuit or proceeds paid therefrom.  The Trustee also objects to the Debtor's exemption of the settlement proceeds because of his failure to timely disclose the cause of action for which a settlement has now been negotiated.  The Trustee contends that the Debtor disclosed the lawsuit only after the insurance company required an order from this Court approving the terms of the settlement of this suit.

Thus, the first issue is whether the Debtor, in view of his failure to timely disclose his cause of action, should now be estopped from amending his Schedule C to exempt the proceeds under the Texas Constitution Article 16, §§ 50-51 and Texas Property Code § 41.001-.002?  The second issue is even if the Debtor is not estopped from amending his Schedule C, may he use the homestead exemption provisions of the Texas Constitution and Texas Property Code to exempt proceeds from the settlement of a lawsuit over an insurance policy insuring his homestead?[2] And, a third issue is if the Debtor is allowed to exempt these proceeds, should the holder of the lien on the Debtor's homestead nevertheless have control over the exempt proceeds to ensure that they are used to repair the Debtor's homestead, thereby maintaining the value of the lienholder's collateral?

---

[2] This Court has recently addressed the issue as to whether a debtor may use the federal "wild card" exemption under 11 U.S.C. § 522(d)(5) to exempt proceeds from the settlement of a lawsuit over an insurance policy insuring the debtor's homestead.  This Court found that the debtor could exempt these proceeds. *In re Okwonna-Felix*, No. 10-31663-H4-13, 2011 WL 3421561 at *7 (Bankr. S.D. Tex. 2011).  Now, in the case at bar, this Court will address whether under the homestead exemption laws of the state of Texas, the Debtor may exempt proceeds from the settlement of a lawsuit over an insurance policy insuring the Debtor's homestead.

## II. FINDINGS OF FACT

1. On September 13, 2008, Hurricane Ike struck and damaged the homestead of the Debtor and his wife, Barbara Hill (Ms. Hill). [Doc. No. 89, ¶3].

2. After Hurricane Ike, the Debtor made a claim on his homeowner's insurance company, Standard Guaranty Insurance Company (Standard Insurance). Standard Insurance paid the Debtor a total of approximately $5,000.00 to be used for repairs to his homestead. [Sept. 12, 2011 Hearing at 11:07:58—11:08:34 a.m.] However, Ms. Hill testified that she received estimates from contractors calculating the hurricane damage to require at least $22,830.00 in repairs. [Sept. 12, 2011 Hearing at 11:07:58—11:08:34 a.m.] Ms. Hill further testified that the estimate of $22,830.00 did not include the cost of repairing the sheetrock within the house, for which she believes repairs would cost an additional $15,000.00. [Sept. 12, 2011 Hearing at 11:09:40—11:09:50 a.m.] Given that Standard Insurance paid only $5,000.00 on the policy, the Debtor and Ms. Hill were unhappy with their carrier and believed that they were entitled to more money. [*See* Sept. 12, 2011 Hearing at 11:03:49—11:09:50 a.m.]

3. On October 3, 2008, the Debtor filed a Chapter 13 bankruptcy petition and his original schedules with the Court. [Docket No. 1].

4. The Debtor did not schedule any claim or cause of action against Standard Insurance in his original schedules. [*See* Schedules A and B, Docket No. 1].

5. In his Schedule C (Property Claimed as Exempt), the Debtor listed his homestead as exempt property pursuant to 11 U.S.C. § 522(d)(1).[3] [Schedule C, Docket No. 1].

---

[3] Any reference herein to the Bankruptcy Code is a reference to 11 U.S.C. Moreover, any reference to a section is a reference to a section of the Bankruptcy Code. Any reference to "Code" is a reference to the Bankruptcy Code.

6.   On January 22, 2010, the Debtor and Ms. Hill, by executing an engagement letter with the Mostyn Law Firm (Mostyn or the Mostyn Law Firm), retained this firm to represent them in connection with their claim against Standard Insurance for its failure to pay the Debtor and Ms. Hill the amount to which they believed they were entitled under their insurance policy. [Doc. No. 76-1]. Under the engagement letter, Mostyn's fee would be 40% of the gross amount recovered by Mostyn. Mostyn is also entitled to recover its out-of-pocket expenses under the terms of the engagement letter executed by the Debtor and Ms. Hill.

7.   Neither the Debtor nor Mostyn informed this Court of the Debtor's retention of the Mostyn, nor did they obtain this Court's approval of the terms of the retention. [Aug. 31, 2011 Hearing at 3:27:29—3:27:54 p.m.]

8.   Gregory F. Cox (Cox) is the Mostyn attorney who was in charge of the Hills' lawsuit against Standard Insurance. Ms. Hill testified that, at her initial meeting with Mostyn in January 2010, she informed the person with whom she met (an unidentified woman) that her husband had filed for bankruptcy. [Sept. 12, 2011 Hearing at 4:14:57—4:15:08 p.m.] Ms. Hill further testified that she first began speaking with Cox's paralegal in May 2011, and did not meet Cox until August 2011. [Sept. 12, 2011 Hearing at 10:47:21—10:47:41 a.m.] For his part, Cox testified that he was unaware of the bankruptcy until a paralegal brought it to his attention a few weeks before June 14, 2011 [Sept. 12, 2011 Hearing at 10:27:53—10:28:54 a.m.]—which was the date the Application to Employ Gregory F. Cox as Special Counsel was filed. [Doc. No. 76].

9.   Additionally, the Trustee and the Debtor's general bankruptcy counsel (Eloise Guzman) were unaware that the Debtor had a claim against Standard Insurance and had retained

Mostyn. [Aug. 31, 2011 Hearing at 3:27:29—3:27:54 p.m., Sep. 12, 2011 Hearing at 10:28:56—10:29:09 a.m.] After listening to the Debtor's credible testimony, the Court finds that the Debtor is a very unsophisticated individual who had no inkling that his claim against Standard Insurance was an asset of his bankruptcy estate.

10. On May 10, 2010, Mostyn filed suit in the District Court of Harris County, 11th Judicial District, Texas on behalf of the Debtor and Ms. Hill against Standard Insurance to recover sums necessary to repair their homestead from damage inflicted thereto by Hurricane Ike. [Sep. 12, 2011 Hearing at 10:26:01 a.m.] This suit is styled *Samuel Hill and Barbara Hill v. Standard Guaranty Insurance Company, Claim Adjustment Specialist, Inc., Arbitrage Adjusting Services, Inc., Matthew Minichelli and Michael Bower*, Cause No. 2010-15205 (the Lawsuit). [Doc. No. 80].

11. On May 19, 2011, approximately one year after the Lawsuit was filed, the Debtor amended his Schedule A to disclose the Lawsuit. [Doc. No. 75]. The Debtor also amended his Schedule C to exempt the Lawsuit and any proceeds that he recovers from the Lawsuit. [Doc. No. 75]. At the time that the Debtor filed this amended Schedule C, no settlement had been negotiated; therefore, there was no specific amount of proceeds set forth as being exempt.

12. On or about June 3, 2011, the parties to the Lawsuit reached a settlement through mediation whereby Standard Insurance agreed to pay $27,000.00 to the Debtor and Ms. Hill, and $25,500.00 jointly to their mortgage company and the Hills, for a total settlement amount of $52,500.00 [Doc. No. 80-1]. The settlement amount of $52,500.00 does not include the $5,000.00 that Standard Insurance had already paid to the Debtor and his wife. [*See* Finding of Fact No. 2].

13.   As previously noted, Cox testified that he became aware of the Debtor's Chapter 13 case a few weeks before June 14, 2011. Cox contacted the Debtor's general bankruptcy counsel, Eloise Guzman, to inform her of the Lawsuit [Sep. 12, 2011 Hearing at 10:28:54—10:29:09 a.m.], and on June 14, 2011, the Debtor filed an Application to Employ Gregory F. Cox as Special Counsel Nunc Pro Tunc (the Application to Employ).

14.   On June 22, 2011, the Trustee  filed his Objection to Debtor's Claim of Exemptions (the Objection to Exemptions), asserting that the Debtor may not claim an exemption in any proceeds recovered from the Lawsuit because under 11 U.S.C. 522(d)(1), the asset is not the Debtor's homestead, but rather a contract claim against his insurance company. [Doc. No. 77].

15.   Additionally, on June 22, 2011, the Trustee filed his Motion to Modify a Confirmed Plan (the Motion to Modify), seeking to increase the total dollars required from the Debtor by the amount of net proceeds recovered from the Lawsuit.[4] [Doc. No. 79].

16.   On June 23, 2011, the Debtor filed his Motion for Approval of Compromise of Controversies: Hurricane Ike Claim Against Standard Guaranty Insurance Company, Claim Adjustment Specialist, Inc., Arbitrage Adjusting Services, Inc., Matthew Minichelli and Michael Bower (the Motion for Approval of Compromise).  [Doc. No. 80].   In paragraph four of the Motion for Approval of Compromise, the Debtor represented that if the proposed $52,500.00 settlement is approved, $21,000.00 would be remitted to Mostyn as attorney's fees[5], $5,481.95.00 would be remitted to Mostyn for

---

[4] The Debtor's plan was confirmed on May 20, 2009. [Doc. No. 56].  Under this confirmed plan, the unsecured creditors will be paid 3% of their claims.  It is this plan which the Trustee seeks to modify so that a greater percentage of the unsecured claims will be paid from distribution of the settlement proceeds from the Lawsuit.

[5] Under the engagement letter that the Debtor and Mostyn entered into in January of 2010, Mostyn is entitled to a fee of 40% of recovery, plus expenses.  40% of $52,500.00 is $21,000.00.

costs, and the remaining $26,018.05 would be paid jointly to the Debtor and the Debtor's

mortgage company, Ocwen Loan Servicing, LLC, ISAOA (Ocwen)[6]. [Doc. No. 80].

17.  On June 27, 2011, the Debtor amended his Schedules a second time by filing Amended

Schedules A and C; at this point, he actually listed the settlement amount of $52,500.00

as an asset, and also listed this amount as exempt under Texas Constitution Article 16, §§

50-51 and Texas Property Code §§ 41.001-.002. [Doc. No. 83].  The Debtor also filed a

Response to the Chapter 13 Trustee's Motion to Modify Plan, in which he asserts that

Texas case law extends the homestead exemption to the proceeds paid by the insurance

carrier on the homestead in settlement of a lawsuit against the carrier for breaching the

insurance contract.  [Doc. No. 84].

18.  On September 12, 2011, Ocwen filed a limited Objection to the Motion for Approval of

Compromise, objecting to the distribution of the attorneys' fees of $21,000.00 and the

attorneys' costs of $5,481.95 to Mostyn because Mostyn failed to comply with 11 U.S.C.

§ 327 and Federal Rule of Bankruptcy Procedure 2016. [Doc. No. 95]. Ocwen also filed

an Objection to the Application to Employ, objecting to the employment of Mostyn for

its failure to: (1) comply with 11 U.S.C. § 327 and Fed. R. Bankr. P. 2016; (2) provide a

benefit to Debtor or Debtor's Estate; and (3) contact Ocwen prior to mediating a

settlement amount of $52,500.00. [Doc. No. 96].

19.  On September 12, 2011, this Court held a hearing on both the Application to Employ and

the Motion for Approval of Compromise.  At this hearing, Ocwen, through its attorney,

announced that it had modified its initial position as set forth in its Objection to Motion

for Approval of Compromise.  Specifically, Ocwen's counsel represented that Ocwen

---

[6] There is no dispute that Ocwen holds a valid and first deed of trust lien on the Debtor's homestead.  That is why the settlement called for the check to be made jointly payable to the Debtor and Ocwen.

wanted: (1) Mostyn to be compensated for costs; (2) Mostyn to be paid a reasonable hour rate for its attorney's fees instead of the contingency fee; and (3) the remaining proceeds to be paid to Ocwen jointly with the Debtor and Ms. Hill to be applied towards repairs on the homestead.   Ocwen further requested that after repairs were made to the Debtor's homestead, any remaining proceeds be applied towards the arrearage on the loan secured by the homestead (which totals $6,476.64), and only after that, any remaining funds should be given to the Debtor or the Trustee.   [Sep. 12, 2011 Hearing at 4:36:39— 4:42:31 p.m.]  The Trustee's position is that the insurance proceeds should first be used to pay the Mostyn Law Firm's fees, with the remainder to be delivered to the Trustee for distribution to unsecured creditors under the Debtor's confirmed Chapter 13 plan. The Debtor, like the Trustee, believes that the Mostyn Law Firm should be paid its fees and expenses pursuant to the engagement letter that the Debtor executed with his wife. However, unlike the Trustee, the Debtor believes that after the Mostyn Law Firm has been paid, the remaining proceeds should be distributed to his wife and himself so that they may use these monies for, among other things, making repairs on his homestead.

20. At this hearing, this Court granted the Application to Employ except for the amount of attorney's fees and expenses to be awarded, and also granted the Motion for Approval of Compromise for the settlement amount of $52,500.00.  However, the Court decided that it wanted to reflect on how the settlement proceeds should be distributed, and therefore continued the hearing on the Objection to Exemptions and the Motion to Modify until October 3, 2011.

21. On September 30, 2011, Ocwen filed an Objection to Trustee's Motion to Modify Plan— asserting that, pursuant to the deed of trust which it holds, the proceeds to be paid from

the settlement of the Lawsuit should not be remitted to the Trustee for distribution to creditors but rather should be paid directly to Ocwen to hold and disburse for repairs to the Debtor's homestead. [Docket No. 102]. Ocwen also argues that if there are proceeds remaining after the homestead has been repaired, those proceeds should be used to pay the arrearage owed to Ocwen, as opposed to the proceeds being paid to the Trustee for distribution to the unsecured creditors under the Debtor's confirmed plan.

22. On October 3, 2011, this Court held the hearing that it had begun on September 12, 2011. This Court stated orally on the record that it had decided to overrule the Objection to Exemptions and deny the Motion to Modify. The Court also stated that it would explain its rulings in a Memorandum Opinion. This, the Court now does.

### III. CREDIBILITY OF WITNESSES

Three witnesses testified during the September 12, 2011 hearing[7]: (1) Cox, the attorney from the Mostyn Law Firm, who is lead counsel for the Debtor in the Lawsuit; (2) Ms. Hill, the Debtor's wife; and (3) the Debtor. Set forth below are the Court's findings concerning the credibility of these witnesses.

A. Gregory F. Cox

Cox testified throughout the day at the hearing on the issue of attorney's fees and costs. This Court finds Cox to be a credible witness.

B. Barbara Hill

Ms. Hill testified throughout the day at the hearing about the hurricane damages to the homestead in which the Debtor and she reside, their lawsuit against Standard Insurance, and their interactions with the Mostyn Law Firm. This Court finds Ms. Hill to be a credible witness.

---

[7] No witnesses testified at the October 3, 2011 hearing.

C. Samuel Hill (the Debtor)

The Debtor testified for about fifteen minutes at the hearing about his interactions with the Mostyn Law Firm. This Court finds the Debtor to be a credible witness.

### IV. CONCLUSIONS OF LAW

**A.   Jurisdiction, Venue, and Constitutional Authority to Sign a Final Order**

1. Jurisdiction

The Court has subject matter jurisdiction over these contested matters pursuant to 28 U.S.C. §§ 1334(b) and 157(a).   These particular matters are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

2. Venue

Venue is proper pursuant to 28 U.S.C. § 1408.

3. Constitutional Authority to Sign a Final Order

Having concluded that this Court has jurisdiction over these contested matters, this Court nevertheless notes that *Stern v. Marshall*, 131 S. Ct. 2594 (2011) sets forth certain limitations on the constitutional authority of bankruptcy courts to enter final orders.   This Court must therefore determine whether it has constitutional authority to sign final orders in the dispute at bar—one order relating to the Objection to Exemptions and the other order relating to the Motion to Modify.   The Court concludes that it does for the reasons set forth below.

> i. *Rationale For Why This Court has Constitutional Authority to Sign a Final Order on the Objection to Exemptions*

> **a. The First Reason:  The facts in *Stern* are distinguishable from the facts in the case at bar**

The facts in the case at bar are easily distinguishable from the facts in *Stern*.   In *Stern*, the debtor filed a counterclaim against a creditor who had filed a proof of claim.   The debtor's

counterclaim was based solely on state law; there was no Code provision undergirding the counterclaim. Moreover, the resolution of the counterclaim was not necessary to adjudicating the claim of the creditor. Under these circumstances, the Supreme Court held that the bankruptcy court lacked constitutional authority to enter a final judgment on the debtor's counterclaim.

In the case at bar, there are both facts and law that give this Court constitutional authority to sign a final order on the Objection to Exemptions. The Objection to Exemptions puts the following issues in dispute: Should the Debtor even be allowed to amend his Schedule C to claim the proceeds as exempt? The resolution of this issue is governed by solely bankruptcy law—not the least of which is the Fifth Circuit's ruling in *Unruh v. Tow* (*In re Unruh*), 265 F. App'x 148 (5th Cir. 2008). That case articulated parameters for disallowance of amended exemptions. In the case at bar, no party—not even the Debtor—disputes that the Debtor initially failed to disclose his claim against Standard Insurance on his Schedules. Indeed, he did not make such disclosure until more than one year after he filed the Lawsuit [Finding of Fact No. 11], and it was only then that he amended his Schedule C to claim the Lawsuit and, any proceeds obtained therefrom, as exempt. [Finding of Fact No. 11]. And then, after the settlement of the Lawsuit was negotiated, the Debtor once again amended his Schedule C to claim the exact amount of the proceeds from the settlement as exempt. [Finding of Fact No. 17]. Under these circumstances, this Court must apply *Unruh* to determine whether to strike the Debtor's amended Schedules for failing to timely disclose the Lawsuit. Resolution of this issue requires application of pure judicially-created bankruptcy law, and therefore this Court concludes that *Stern* has no application and that this Court has constitutional authority to enter a final order on this issue.

### b. The Second Reason:  Even if *Stern* Applies, the "Public Rights" Exception Articulated in *Stern* Applies in the Case at Bar

In the alternative, even if *Stern* somehow applies, this Court concludes that the one exception articulated in *Stern* by the Supreme Court applies—specifically, that this Court may enter a final order over essential bankruptcy matters under the "public rights" exception.  Under *Thomas v. Union Carbide Agric. Prods. Co.*, a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal.  473 U.S. 568, 593 (1985).  The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006); *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'").  *But see Stern*, 131 S. Ct. at 2614 n.7 ("We noted [in *Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").

The key issue before this Court involves a dispute over whether or not certain property (i.e. the Lawsuit and the proceeds flowing therefrom) is exempt or is not exempt—and therefore property of the estate.  The right to exempt property from the bankruptcy estate is established by an express provision of the Bankruptcy Code (section 522) and is central to the public bankruptcy scheme, as it relates to both the exercise of exclusive jurisdiction over the debtor's property (because before property can become exempt, it is property of the estate[8]) and the equitable distribution of that property among a debtor's creditors.  *See Katz*, 546 U.S. at 363–64

---

[8] For a more detailed discussion of just exactly how and when property of the estate becomes exempt property, see *Calvin v. Wells Fargo Bank, N.A.* (*In re Calvin*), 329 B.R. 589, 597 (Bankr. S.D. Tex. 2005).

(noting that a discharge is among the "[c]ritical features" of a bankruptcy proceeding).  As such, this determination is not only inextricably tied to the bankruptcy scheme, but it also involves the adjudication of rights created by the Bankruptcy Code.  For these reasons, this matter falls within this Court's authority, and therefore this Court may enter a final order on the Objection to Exemptions.

> ### ii. Rationale For Why This Court has Constitutional Authority to Sign a Final Order on the Motion to Modify

The other matter pending before this Court is the Motion to Modify. This Motion is brought pursuant to § 1329(a)(1).  Both Ocwen and the Debtor oppose this Motion, thus putting the relief requested by the Trustee in dispute.  What is not in dispute, however, is that this matter arises solely out of a pure bankruptcy statute, namely § 1329(a)(1).   Indeed, the Debtor's confirmed plan, which the Trustee now seeks to modify so that the settlement proceeds from the Lawsuit are used to pay a higher percentage of unsecured claims, was confirmed pursuant to § 1325(a)—which is a process that is uniquely done under the Bankruptcy Code.   There is absolutely no state law involved in confirmation of a Chapter 13 plan, or modification of such a plan.  For these reasons, *Stern* is entirely inapplicable and this Court has the constitutional authority a sign a final order regarding the Motion to Modify.

## B.   The Debtor is Not Barred or Estopped From Amending His Schedules

This Court will first address whether the Debtor's amended exemption of the total amount from the settlement—$52,500.00—should even be allowed.  Amendments to exemptions are generally and liberally allowed under Bankruptcy Rule 1009. Fed. R. Bankr. P. 1009(a) ("A voluntary petition, list, schedule, or statement may be amended by the debtor *as a matter of course at any time before the case is closed*.") (emphasis added).  The debtor's right to amend schedules is not, however, absolute.  An exception to this general rule is that "if there is a

showing of the debtor's bad faith or of prejudice to the creditors," an amendment may be denied. *Unruh*, 265 F. App'x 148, at 150 (5th Cir. 2008) (quoting *Stinson v. Williamson (In re Williamson)*, 804 F.2d 1355, 1358 (5th Cir. 1986)).[9]  This "difficult standard" must be met to justify denying a debtor the right to amend his schedules.  *See McFatter v. Cage*, 204 B.R. 503, 509 (S.D. Tex. 1996).

      1.    The Debtor Did Not Act in Bad Faith

     If the Debtor acted in bad faith in amending his Schedules, the Court may deny the amendment. *Unruh* provides a definition of bad faith. 265 F. App'x at 150.  *Unruh* concluded that a "finding of bad faith requires some form of deception, such as an effort to mislead creditors or to conceal assets, as opposed to a mere mistaken failure to list an asset or to claim an exemption." *Id.*  (citing *McFatter*, 204 B.R. at 508–09 ) (concluding that a debtor's mere silence as to his intent concerning the questionable asset's classification as a homestead was insufficient to show bad faith).[10]  Analogously, in the recent case of *Reed v. City of Arlington*, 650 F.3d 571,574 (5th Cir. 2011) (en banc), the Fifth Circuit Court of Appeals stated that for judicial estoppel to apply, the party must not have acted "inadvertently."  The court went on to judicially estop the debtor from collecting the prepetition judgment he had obtained because he deliberately did not list the lawsuit as an asset on his schedules[11]. *Id.*

---

[9] The Fifth Circuit has applied this liberally construed general rule since at least 1969. *In re Williamson*, 804 F.2d at 1358 (citing *Thompson v. Powell*, 413 F.2d 276, 277 (5th Cir. 1969)).  In 1986, the Fifth Circuit adopted the Eleventh Circuit's rule that "a court may deny leave to amend if there is a showing of the debtor's bad faith or of prejudice to the creditors." *In re Williamson*, 804 F.2d at 1358 (quoting *Doan v. Hudgins (In re Doan)*, 672 F.2d 831, 833 (11th Cir. 1982)).

[10] *Unruh* also broadens the definition of bad faith to include not only a concealment, but also "a gross and deliberate understatement of the value of an asset, made in an attempt to deceive creditors or the bankruptcy court." *In re Unruh*, 265 F. App'x at 150.

[11] The initial opinion barred both the debtor and the Chapter 7 trustee from collecting the judgment. *Reed v. City of Arlington*, 620 F.3d 477, 482 (5th Cir. 2010), *vacated*, 650 F.3d 571, 579 (5th Cir. 2011) (en banc).  However, in a later en banc opinion, the Court held that while the debtor was barred from collecting the judgment, the trustee was not. *Reed v. City of Arlington*, 650 F.3d 571, 579 (5th Cir. 2011) (en banc).

Here, the Debtor acted inadvertently in failing to initially schedule his claim against Standard Insurance, and later failing to amend his Schedules in order to list the Lawsuit once it was filed[12].   The Debtor was not intentionally deceptive; he is an unsophisticated individual whose testimony convinced the Court that he did not understand the need to notify the Court of his potential cause of action against Standard Insurance or the Lawsuit once it was filed. [Finding of Fact No. 9].   Based on the "difficult standard" necessary to show bad faith, the Debtor's failure to timely disclose his claim against Standard Insurance was a "mistaken failure" rather than deception.   *See McFatter*, 204 B.R. at 508–09. Therefore, the Debtor did not act in bad faith.

Even if a finding of bad faith is a close call—which this Court does not believe is the case here—the Fifth Circuit has a long history of giving the benefit of doubt to the debtor with respect to the homestead exemption.   *See State Farm Life Ins. Co. v. Swift* (*In re Swift*), 129 F.3d 792, 801 (5th Cir. 1997) ("Texas courts construe the scope of exemptions liberally, with most doubts about the existence of an exemption resolved in favor of the debtor claiming the exemption."). Granted, the matter at bar is not a typical homestead exemption dispute, but rather a dispute over who is entitled to receive proceeds from the settlement of a lawsuit involving the insurance policy of a homestead.   Nevertheless, because the dispute could not have arisen but for the existence of the Debtor's homestead, this Court believes that it should take into account the Fifth Circuit's lengthy history of favoring homestead exemptions in concluding that the Debtor did not act in bad faith.

---

[12] The Lawsuit was not commenced until two years after the Debtor's bankruptcy petition was filed.

2. The Creditors Were Not Prejudiced By the Debtor's Untimely Disclosure of His Claim Against Standard Insurance

In the alternative, the Court may also deny the amended exemption if creditors have been prejudiced as a result of the Debtor's failure to disclose.  In the Fifth Circuit, this analysis must focus on the harm to the creditors' litigating posture caused by some detrimental reliance on the Debtor's initial position.  *In re Williamson*, 804 F.2d at 1358.  Prejudice to the creditors' litigation posture "does not occur merely because an amendment, if properly allowed, permits the debtor to assert a claim that ultimately prevails on the merits."  *Id.*

Here, it has not been shown that the creditors—or the Trustee acting on their behalf—relied on the Debtor's failure to timely disclose his claim against Standard Insurance in choosing a litigation posture.  There is no evidence that the Trustee or the creditors relied on the Debtor's original Schedules in choosing a litigation route.  Accordingly, there has been no showing that the Trustee or the creditors were prejudiced.

Under the circumstances discussed above, this Court concludes that the Debtor is not estopped from amending his Schedule C to seek to exempt the proceeds to be paid from the settlement of the Lawsuit.  The Court now addresses whether the Debtor's asserted exemption is allowed under Texas law.

## C.   Texas Law Regarding Homestead Exemption Allows the Debtor to Exempt All of the Proceeds From the Settlement of the Lawsuit

A "basic" rule of bankruptcy law is that "state law governs the substance of claims." *In re McCombs*, 2011 WL 4553052, at *2 (5th Cir. Oct. 4, 2011).  Congress "generally left the determination of property rights in the assets of a bankrupt's estate to state law. Unless some federal interest requires a different result, there is no reason why [property] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."

*Id.* In this case, the Debtor has claimed the settlement proceeds from the Lawsuit as exempt under the Texas laws governing the homestead exemption.

In order to prevent a "debtor from becoming destitute, the Texas legislature enacted a scheme of exemptions that limits the ability of creditors to reach certain essential assets of the debtor. The decision to exempt property is an important one, recognizing that the exempt property is vital to the debtor's continued existence." *In re Swift*, 129 F.3d at 801. Generally, Texas courts liberally construe the scope of exemptions, "with most doubts about the existence of an exemption resolved in favor of the debtor claiming the exemption." *Id.*; *see also In re Norris*, 413 F.3d 526, 528 (5th Cir. 2005). In doing so, courts look beyond the plain language of the statutes to examine the exemption's purpose and intent. *Stephenson v. Wixom*, 727 S.W.2d 747 (Tex. App.—Fort Worth, 1987). In numerous cases, they have extended specific exemptions to include the proceeds from the disposition of exempt property, including proceeds from an insurance policy or lawsuit. *In re Swift*, 129 F.3d 792, 801 (finding that "proceeds, insurance, cause of action, etc., are a substitute for the exempt property that is lost. To be effective, the substitute must be treated as if it were the lost item. Otherwise, the protection provided by the exemption would be meaningless, and creditors could attack the unfortunate debtor").

The homestead exemption is defined by Texas Constitution Article 16, § 50, which provides that

"[t]he homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for [certain exceptions not relevant here].... No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for [certain exceptions not relevant here]. . ."

As explained by the United States Supreme Court, "Texas establishes the family home or place of business as an enclave exempted from the reach of most creditors." *U.S. v. Rodgers*, 461 U.S. 677, 684 (1983). *Id.* In the seminal case of *Swayne v. Chase*, 88 Tex. 218, 225 (Tex.1895),

where the plaintiffs' home was destroyed by fire, the Texas Supreme Court ruled that the

proceeds of an insurance policy take the place of the property loss, and that the Texas courts may

not limit the value of such funds under the homestead exemption. *Id.* at 225-27 (stating that "the

courts of this state have no power to say that only a reasonable portion of such a fund shall be

exempt. It is all exempt when derived from a policy on the homestead improvements."); *Price v.*

*Price*, 394 S.W.2d 855, 858 (Tex. Civ. App. 1965) (holding that "[w]hen the house . . . is

destroyed by fire and there exists thereon a policy by insurance, the money arising therefrom

stands in the place instead of such house . . . The proceeds of the policy, therefore, take the place

of the property loss"). Moreover, in *In re Barbe*, 2006 Bankr. LEXIS 513, at *3 (Bankr. E.D.

La.), the Bankruptcy Court of the Eastern District of Louisiana extended the Louisiana

homestead exemption to cover proceeds from an insurance claim for damages caused by

Hurricane Katrina[13].

    In the case at bar, the Debtor relies upon Texas homestead exemption laws to claim as

exempt the settlement proceeds from the Lawsuit.  [Finding of Fact Nos. 11, 17].  The proceeds

at issue stem from the settlement of the Debtor's lawsuit against Standard Insurance for its

alleged failure to pay sufficient funds to repair damages caused by Hurricane Ike to the Debtor's

homestead. [Finding of Fact Nos. 2, 10, 12]. Under Texas case law, both proceeds from a

lawsuit or from an insurance policy are potentially exemptible.  *In re Swift*, 129 F.3d 792, 801.

Accordingly, the proceeds from the settlement of the Lawsuit, no matter what their

characterization, are eligible to be exempted.  Similar to *Swayne* and *Barbe*, the proceeds here

emanate from an event (i.e. a hurricane) that caused the property loss (i.e. the damages caused to

the homestead by Hurricane Ike) [Finding of Fact No. 1]. Because *Swayne* held that the proceeds

---

[13] Louisiana law, similar to Texas law, construes the homestead exemption liberally. *See In re Barbe*, at *3.

of an insurance policy take the place of the property loss, the proceeds from Standard Insurance

therefore take the place of the property loss associated with the Debtor's homestead[14].

Moreover, because a court may not limit the value of such proceeds under the homestead

exemption, the Debtor may exempt the entire settlement amount of $52,500.00.  Accordingly,

the Court accepts the second amended Schedule C which the Debtor filed on June 27, 2011, and

this second amendment supersedes the first amended Schedule C file on May 19, 2011, which in

turn superseded the original Schedule C.[15]

**D.**  **Even Though the Debtor May Exempt the $52,500.00 Under the Homestead Exemption, the Deed of Trust Held by Ocwen Grants it a Lien on These Proceeds**

Simply because the Court has decided to allow the Debtor to exempt the $52,500.00 does

not, however, mean that these proceeds should be paid to the Debtor for his unfettered use.

Pursuant to the deed of trust, Ocwen still has an interest in these proceeds and a large voice in

how the proceeds are to be used.  Moreover, so does Mostyn.  This law firm wants its 40%

contingency fee and reimbursement of expenses pursuant to the engagement letter which the

Debtor and his wife signed on January 22, 2010. [Finding of Fact No. 6].  The Debtor and his

wife, as well as the Trustee, support Mostyn's request for its 40% fee and expenses.  [Finding of

Fact No. 19].  Initially, Ocwen opposed Mostyn receiving a 40% contingency fee. [Finding of

Fact Nos. 18, 19].  However, at the October 3, 2011 hearing, Ocwen's counsel represented to this

---

[14] In the case at bar, it is not simply that the proceeds come from the insurance policy that the Debtor has with Standard Insurance.  Rather, the proceeds come from the settlement of a lawsuit that the Debtor filed against Standard Insurance in which he alleged that this carrier breached the insurance contract.  Although the facts in the case at bar differ in this respect from those in *Swayne*, this Court nevertheless concludes that this distinction should not bar the Debtor from exempting the proceeds paid by Standard Insurance.  The Court arrives at this conclusion due to the liberal construction of the homestead laws of the state of Texas.

[15] The Court also accepts the Debtor's first amended Schedule A and second amended Schedule A (which schedules the lawsuit as an asset of the estate), which the Debtor also filed on May 19, 2011 and June 27, 2011, respectively. [Docket Nos. 75, 83].

Court that Ocwen had decided after all not to oppose Mostyn receiving its 40% contingent fee

and expenses under the engagement letter between Mostyn, the Debtor, and his wife.

Given this change in position by Ocwen, and given that the Debtor and the Trustee

support Mostyn receiving its 40% contingency fee plus expenses, and given that Mostyn's

services have rendered a tangible, identifiable, material benefit for the Debtor[16], this Court has

decided that Mostyn's request for its fees and expenses should be granted—with one change.

The Court has decided to reduce Mostyn's fees by $1,000.00 because Mostyn failed to timely

file its Application to Employ. *See Fanelli v. Hensley (In re Triangle Chemicals, Inc.),* 697 F.2d

1280, 1284 (5th Cir. 1983) (the bankruptcy court has wide discretion in reducing any fee

arrangements requested in a nunc pro tunc application[17]). Accordingly, the Court has decided

that Mostyn should receive attorney's fees of $20,000 and $5,481.95 for expenses, which leaves

$27,018.05 (the Remaining Proceeds) for the Debtor[18].

Based upon representations and arguments made at the September 12, 2011 hearing and

at the October 3, 2011 hearing, Ocwen wants all of the Remaining Proceeds (i.e., $27,018.05) to

be paid jointly to itself, the Debtor, and Ms. Hill.  Ocwen believes the Remaining Proceeds

should be used for repairing the homestead, with any remainder to go to pay off the arrearage on

---

[16] *See In re Pro-Snax Distribs., Inc.*, 157 F.3d 414, 426 (5th Cir. 1998).

[17] In January 2010, the Debtor's wife informed the Mostyn Law Firm that her husband had filed for bankruptcy. [Finding of Fact No. 8]. Yet, Mostyn did not file its Application to Employ until June 14, 2011. [Finding of Fact No. 13]. Thus, Mostyn delayed for 18 months in seeking this Court's approval to represent the Debtor. Candidly, the Mostyn Firm is fortunate that this Court did not reduce its fees by more than $1,000.00, as this delay in obtaining Court approval to represent the Debtor is entirely unacceptable. However, because Mostyn obtained a very beneficial result for the Debtor, and because Mostyn has made changes internally to ensure that in the future, it timely files applications to represent any of its clients who file for bankruptcy, the Court has decided to reduce Mostyn's fee in this case by only $1,000.00.

[18] Under the engagement letter that the Debtor entered into with Mostyn, the law firm is entitled to receive 40% of the gross amount that is recovered. In the case at bar, this amount would be $21,000.00 (i.e. 40% of $52,500.00). [Finding of Fact No. 6]. However, even though this Court granted the Application to Employ on September 12, 2011, the Court has now decided to deduct $1,000.00 of the $21,000.00 of the 40% contingency fee because Mostyn did not timely file the Application to Employ. Therefore, the "Remaining Proceeds" are calculated as follows: $52,500.00 - $20,000.00 - $5,481.95= $27,018.05.

the loan secured by the homestead.  Anything remaining after those payments would then—and

only then—go to the Trustee for disbursement to unsecured creditors under the Debtor's

confirmed plan.  [Finding of Fact No. 19].  Stated differently, Ocwen objects to the Debtor

exempting $27,018.05 to the extent that the Debtor wants to use those proceeds for something

other than repairs to his homestead or paying down the arrearage.  [Finding of Fact No. 19].

### 1.   Discussion Regarding the Remaining Proceeds

As already noted, Ocwen has a first lien on the Debtor's homestead pursuant to the deed

of trust.  [Finding of Fact No. 16 and Footnote No. 6]  It also has a lien on any insurance

proceeds paid by a third party, which in this case is Standard Insurance.  Paragraph 5 of the deed

of trust expressly assigns a security interest in the insurance proceeds to Ocwen[19], while

Paragraph 10 expressly assigns a security interest in all "miscellaneous proceeds" to Ocwen.[20]

[Doc. No. 94-1, p. 6, 9].  Thus, although the Debtor has the right to exempt the Remaining

Proceeds, the Debtor does not have the unfettered use of these proceeds.  Because Ocwen has a

lien on these proceeds, Ocwen has a say in how these proceeds are to be used.

And, indeed, Ocwen's voice in this matter is set forth in the deed of trust signed by the

Debtor.  The deed of trust held by Ocwen, in pertinent part, sets forth the following:

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,
> whether or not the underlying insurance was required by Lender, shall be applied
> to restoration or repair of the Property, if the restoration or repair is economically

---

[19] "If Borrower obtains any form of insurance coverage . . . such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee."

[20] "All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender. If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if restoration or repair is economically feasible and Lender's security is not lessened. . . . If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower." [Doc. No. 94-1, p. 9]. According to the Definitions section of the deed of trust, "'Miscellaneous Proceeds' means any compensation, settlement, award of damages, or proceeds paid by any third party . . . for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property." [Doc. 94-1, p. 2].

feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.

[Doc. No. 94-1, p. 6].

The language cited above reflects that Ocwen has more than an abiding interest in ensuring that the value of its collateral (i.e., the Debtor's homestead) is maintained, if not enhanced. The language in the deed of trust leaves no doubt that Ocwen has the contractual right to hold the $27,018.00, so long as repairs are being made to the Debtor's homestead. Ocwen has the discretion to disburse the proceeds from time to time as repairs are completed. Thus, while the Debtor has the right to exempt the $27,018.00 pursuant to the homestead exemption under Texas law, this right is not unfettered. The $27,018.00 will not be remitted to the Debtor for his use at any time and for anything. Rather, Ocwen will hold the funds and ensure that they are used to make repairs on the Debtor's homestead, which also happens to be Ocwen's collateral. In this matter, not only are the statutory rights of the Debtor protected; so are the contractual rights of the home lender, Ocwen.

2.   Discussion Regarding Any Proceeds Remaining After the Debtor's Homestead Has Been Repaired

What remains to be decided is what happens to any of the $27,018.00 that remains after repairs have been made to the Debtor's homestead. The Trustee takes the position that after the repairs have been made, the remainder of the proceeds should be remitted to the Trustee for distribution to creditors pursuant to the confirmed plan in this case[21]. [Finding of Fact No. 19].

---

[21] The Trustee's position initially was that the Debtor was not entitled to exempt any of the settlement proceeds because the Debtor had failed to timely disclose his claim against Standard Insurance. However, once this Court announced that the Debtor is entitled to exempt the settlement proceeds, the Trustee modified his position to argue that the Debtor should only be able to exempt those proceeds that are sufficient to repair the homestead, and that any

Ocwen, however, opposes the Trustee. Ocwen argues that the rights that it has under the deed of trust dictate that the remainder of the funds should be applied toward the arrearage of $6,476.64.00 on the note secured by the Debtor's homestead, and only if any funds remain thereafter, should they be remitted to the Trustee for distribution according to the confirmed plan. [Finding of Fact No. 19].

Because this Court has already concluded that Ocwen has a valid lien on the proceeds presently held by Standard Insurance, the Court rejects the Trustee's argument that he should receive all funds that remain after the repairs have been made so that he may distribute them to unsecured creditors under the Debtor's confirmed plan. These funds are simply proceeds of Ocwen's collateral, and their use is dictated by the deed of trust. As this Court has already noted above, the deed of trust requires that Ocwen hold the proceeds to ensure that payment is made for repairs on the homestead. Furthermore, Paragraphs 2, 5, and 10 of the deed of trust, when read collectively, provide that after the insurance proceeds are applied towards repairs, then they should be applied towards past due interest and principal under the security instrument. However, before any of the Remaining Proceeds are used, Ocwen shall remit to the Trustee $1,000.00 for distribution according to the Debtor's Chapter 13 plan[22], which leaves Ocwen and the Debtor with $26,018.00. Subsequently, any funds remaining after the $26,018.00 has been applied first to repairs and second, against the arrearage, will then go to the Trustee[23].

---

proceeds remaining thereafter should not be applied to pay the arrearage owed to Ocwen, but rather should be used to pay unsecured creditors under the Debtor's confirmed plan.

[22] This $1,000.00 represents monies that would have gone to Mostyn if it had filed its Application to Employ on a timely basis. *See* footnote 17. Ocwen, although holding a lien on the $1,000.00 pursuant to its deed of trust, does not oppose these particular funds being remitted to the Trustee for distribution to unsecured creditors. Nor does the Debtor.

[23] Based upon the testimony given by Ms. Hill about the estimated cost of the repairs [Finding of Fact No. 2], and based upon the amount of the arrearage, it is extremely doubtful that there will be any funds left over for the Trustee to distribute to unsecured creditors.

## V. CONCLUSION

Because it is the Debtor and Ms. Hill who have the insurance policy with Standard Insurance, the check from Standard Insurance must be made payable not only to Ocwen, but also to the Debtor and Ms. Hill.  However, it will be Ocwen which holds the Remaining Proceeds, ensuring that all of these monies (except the $1,000.00 to be paid to the Trustee) are used first to pay for repairs on the Debtor's homestead, and then—if there are any proceeds remaining after all repairs are paid for—to pay the arrearage on the loan secured by the homestead. Indeed, the Debtor may not come back to court to say that he does not want to use all of the Remaining Proceeds to make repairs and pay off the arrearage, but rather wants to use some of these monies for some other purpose.

Even if this Court had not allowed the Debtor to exempt the proceeds due to his failure to timely disclose his claim against Standard Insurance, the deed of trust language would still have allowed Ocwen to properly assert its lien and control how the settlement proceeds are used. Thus, the Trustee, under either scenario, winds up with nothing for the unsecureds—except the $1,000.00 that would have otherwise gone to Mostyn and which Ocwen is willing to release its lien on so that the Trustee can distribute these monies to the unsecured creditors.  While this result may seem unfair, where the Debtor failed to disclose his claim against Standard Insurance, the cold hard fact is that Ocwen has a properly perfected first lien on any proceeds paid by any insurance carrier, and Ocwen also has the right:  (1) to hold the proceeds to ensure that its collateral (i.e. the Debtor's homestead) is repaired; and (2) to then ensure that any remaining proceeds are applied against the arrearage owed by the Debtor.  Thus, the Debtor's homestead is preserved for his use and benefit regardless of his failure to timely disclose his claim against Standard Insurance.  While this Court is not enamored with any debtor's failure to disclose an

asset of the estate, given the circumstances in this case, and given the liberal construction of the homestead laws in the state of Texas, the Debtor's failure to initially disclose his claim against Standard Insurance comes within the category of "No harm, No foul."

For all of the reasons set forth herein, the Court overrules the Objection to Exemptions and denies the Motion to Modify. Orders consistent with this Memorandum Opinion have already been entered on the docket[24].

Signed on this 30th day of December, 2011.

Jeff Bohm
United States Bankruptcy Judge

---

[24] Although the Court denied the relief requested in the Trustee's Motion to Modify, the Court orally directed the Trustee to distribute to unsecured creditors the $1,000.00 that would otherwise have gone to the Mostyn Law Firm. These funds are to be distributed to unsecured creditors pursuant to the Debtor's confirmed Chapter 13 plan.